[Cite as *Elsass v. St. Marys City School Dist. Bd. of Edn.*, 2011-Ohio-1870.]

## IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## AUGLAIZE COUNTY

TOM F. ELSASS,

      PLAINTIFF-APPELLEE,
      CROSS-APPELLANT,          CASE NO. 2-10-30

      v.

ST. MARYS CITY SCHOOL DISTRICT
BOARD OF EDUCATION,          **O P I N I O N**

      DEFENDANT-APPELLANT,
      CROSS-APPELLEE.

**Appeal from Auglaize County Common Pleas Court**
**Trial Court No. 2010 CV 0199**

**Judgment Affirmed in Part, Reversed in Part**
**and Cause Remanded**

**Date of Decision:   April 18, 2011**

APPEARANCES:

      *Brian L. Wildermuth and James K. Stucko, Jr.* **for**
      **Appellant/Cross-Appellee**

      *Christine A. Reardon and Bethany German Ziviski* **for**
      **Appellee/Cross-Appellant**

**WILLAMOWSKI, J**.

{**¶1**} Defendant-Appellant, St. Marys City School District Board of Education ("St. Marys" or "the Board"), appeals the judgment of the Auglaize County Court of Common Pleas reviewing St. Marys' decision to terminate the teaching contract of Plaintiff-Appellee, Tom F. Elsass ("Elsass"). St. Marys argues that the trial court erred when it modified the termination order to award Elsass eight months of back pay even though it affirmed his termination for lewd behavior. Cross-Appellant Elsass, however, claims that the trial court committed reversible error when it failed to reinstate him to his teaching position with Cross-Appellee St. Marys. For the reasons set forth below, the judgment is reversed in part and affirmed in part.

{**¶2**} Prior to his termination, Elsass had been a mathematics teacher for thirty-four years and had worked for St. Marys' for approximately twenty years. Elsass was employed at Memorial High School under a continuing service contract. On September 11, 2009, the Board passed a resolution to initiate termination proceedings after Elsass was charged with public indecency and voyeurism following an incident that occurred during a school sporting event.

{**¶3**} On the evening of September 3, 2009, Elsass and his family traveled to watch his daughter play varsity volleyball for St. Marys at the Elida field house. Meanwhile, William Koontz ("Koontz") and his six-year-old daughter were

waiting in their van at the field house parking lot to pick up Koontz's older daughter. Koontz's van was parked about 20-30 yards from Elsass' vehicle. While they were waiting, Koontz reported that he and his young daughter observed a man wearing a green shirt and khaki shorts standing behind his vehicle and masturbating while watching a group of junior varsity girls who were standing outside the field house. Upon realizing what the man was doing, Koontz said that he jumped out of his van, called out "you sick son of a bitch," and started to chase the man. Koontz claimed that the man hastily tucked his penis back into his pants, took off towards the field house and went inside. Koontz returned to his van and called the police.

{¶4} When the police arrived, Koontz described the man and what he had observed. Based upon Koontz's description, the police officers located Elsass inside the field house and asked him to step outside for questioning. Koontz confirmed that Elsass was the man he had seen.

{¶5} Elsass, however, vehemently denied that he had been doing anything improper. He claimed that he was outside by his car talking with his wife and two friends between volleyball matches. He remained by his car after the women returned to the game in order to smoke a cigarette. Elsass stated that he then noticed that he had a wet spot on his shorts. He had gone to the restroom prior to coming outside and Elsass claimed that he had long suffered from a problem

whereby he leaked urine after he went to the bathroom. Elsass didn't want to return to the field house with a "pee stain" on his pants, so he claimed that he vigorously rubbed his pants, "inside and out," in order to get rid of the wet spot. He acknowledged that he was looking at the JV girls at the time, but claimed that he was merely trying to gather the names off the backs of the girls' volleyball jerseys so that he could report them to their coach (the JV girls were supposed to remain inside to watch the varsity team play). After questioning Elsass and Koontz and taking their statements, the police officers allowed everyone to leave.

{¶6} The following day at school, the school superintendent obtained a police report from the Allen County Sheriff's Department and met with Elsass after classes. At that meeting, Elsass was informed that he was facing criminal charges based upon the allegations that had been made by Koontz the night before. Elsass was given the choice of either resigning or being fired. Being confronted with only those two options, Elsass originally stated that he would resign and retire.

{¶7} However, Elsass did not resign, contending that being forced to do so without being given an opportunity to respond to the charges was a violation of his due process rights. St. Marys then scheduled two meetings to provide Elsass an opportunity to respond to the charges. Elsass did not appear at either meeting

based upon his attorney's advice to refrain from discussing the matter while the criminal charges were pending.

{¶8} On September 11, 2009, the Board met and passed a resolution to initiate termination proceedings and to suspend Elsass without pay during the pendency of the termination proceedings. (Resolution No. 141-09, Joint Ex. 1.) Specifically, the board resolved that the following facts gave rise to good and just cause for termination:

> **1. On September 3, 2009, Mr. Elsass was observed masturbating while standing in a parking lot at Elida Local Schools in Elida, Ohio.**
>
> **2. On September 3, 2009, Mr. Elsass was observed masturbating while standing in a parking lot at Elida Local Schools in Elida, Ohio, while looking at a group of girls.**
>
> 3. **On September 4, 2009, Mr. Elsass was summoned and charged with public indecency (O.R.C. 2907.09) and voyeurism (O.R.C. 2907.08) for the conduct referred to in paragraphs 1 and 2 above**.

(Id.)

{¶9} After receiving notice of the Board's resolution, Elsass requested a hearing before a neutral referee pursuant to his rights under R.C. 3319.16. The parties mutually selected attorney Jeffrey Amick to decide the disputed facts. Referee Amick postponed the hearing twice, at Elsass' request, to allow for the criminal matter to be resolved. On February 1, 2010, the criminal charges against

Elsass were dismissed, without prejudice, and the hearing commenced on March 4, 2010.

{¶10} At the hearing, Koontz testified about the events he claimed he and his daughter witnessed in the parking lot. Deputy John Chiles from the Allen County Sheriff's Department also testified as to his investigation of the incident that evening and about what he observed when he questioned Koontz and Elsass. Deputy Chiles testified that Elsass originally told him that he had not left the field house. The deputy also testified that Elsass appeared nervous and that "[w]ith my experience,[1] how Mr. Elsass was acting, it appeared that he was hiding something that he didn't want me to know." (Mar. 4, 2010 Tr., p. 57.) Deputy Chiles' police report also stated that while he was questioning Koontz, the young daughter "was making masturbation gestures" and indicated "that guy was doing this." (Sep. 3, 2009 Supplemental Offense Report).

{¶11} On cross-examination, Elsass' lawyer questioned Koontz about several matters pertaining to his credibility, including a domestic violence call, a criminal charge, and the fact Koontz had been terminated from his position as a Special Deputy to the Allen County Sheriff's Office for obstructing official business. Elsass claims that Koontz was unreliable and his credibility was questionable. Under cross-examination, Deputy Chiles acknowledged that Elsass'

---

[1] Deputy Chiles had previously testified that he had been a law enforcement officer for fifteen years.

answer as to whether he had been outside could have been a misunderstanding as to whether he had "just" been outside or whether he had been outside earlier. Deputy Chiles also acknowledged that Elsass' demeanor could have been the result of other factors.

{¶12} Elsass then testified as to his version of the events that evening. While many of the facts that Koontz and Elsass testified to were not in dispute, their stories differed dramatically as to whether Elsass was masturbating, with his penis exposed, or merely "flapping" his pants to dry a wet spot on his pants. Also, Elsass denied ever seeing or hearing Koontz yell and come towards him; he claims he just finished his cigarette, rubbed the wet spot off of his pants, and returned to the field house.

{¶13} In addition to testimony from Elsass and his wife, Elsass' attorney called fourteen character witnesses, including Elsass' pastor, members of his church, many long-time friends and neighbors, parents of children Elsass had taught, a school secretary, and some professional colleagues. These witnesses testified as to Elsass' good character, his excellent reputation in the community, his truthfulness, and his numerous unselfish, charitable, and civic-minded deeds and activities. Many of Elsass' witnesses also testified about what a dedicated and outstanding teacher Elsass was and how much his students liked him and learned from him. The referee noted, however, that only one of the fourteen character

witnesses had been at the game on the evening of September 3, 2009, and some of her testimony contradicted details in Mrs. Elsass' testimony.

{¶14} Elsass also personally testified about his education, his teaching experience, his church and community activities, and his professional accomplishments and accolades. When Elsass began introducing performance reviews from the 1980's from a different school district, St. Marys' attorney objected as to the relevancy of this material, arguing that Elsass' performance as a teacher was not being questioned. He stated that Elsass' termination was based upon the sole issue of whether or not he had masturbated in the school parking lot on September 3, 2009.

{¶15} Elsass' attorney argued that "just cause" was bigger than what happened that night and that it required looking at a teacher's entire history. After a discussion of the matter, the referee sustained the objection but allowed Elsass' attorney to proffer approximately thirty exhibits pertaining to Elsass' achievements in mathematics and education that they would have submitted. St. Marys' also proffered six exhibits showing that Elsass had been disciplined several times for unethical behavior and unprofessional conduct. The parties filed post-hearing briefs for the referee's consideration.

{¶16} On April 23, 2010, Referee Amick issued a detailed twenty-page "Findings of Fact" reviewing the undisputed facts, the disputed issue, the salient

testimony of the five primary witnesses, and the matters affecting credibility as related to Koontz, Deputy Chiles, Elsass, and the character witnesses. The referee acknowledged that the sole issue in dispute was whether Elsass had committed the lewd act in the field house parking lot and discussed his responsibility as follows:

> **Thus, in order to resolve this sole issue, this Referee must review, dissect, analyze and carefully consider the salient testimony, and ultimately determine which testimony is believable, and what facts are more likely to have occurred. In essence, such determination rests solely upon a determination of which of the witnesses this Referee finds, by a preponderance of the evidence, to be more credible.**

(Referee's Findings of Fact, p. 4.)

{¶17} In his final analysis, the referee concluded that the greater weight and credibility should be afforded to the testimony of Koontz. Koontz did not know Elsass before that evening and had nothing to gain by the outcome of the proceedings. The referee "did not discern a scintilla of evidence to discern a motive which would cause Koontz to fabricate a story involving Elsass' actions." (Id. at p. 18.) In contrast, the referee found that Elsass' own self-interests provided a motivation to fabricate his testimony and that "Elsass' rendition of the facts evokes more questions than it provides plausible explanation." Id. Referee Amick's conclusion stated that the findings of fact supported the Board's decision to terminate Elsass' teaching contract for good and just cause.

{¶18} At the May 12, 2010, St. Marys' School Board meeting, the Board considered the matter for almost an hour in executive session. After returning to regular session, the Board unanimously acted upon the referee's recommendation and terminated Elsass' continuing employment contract.

{¶19} Pursuant to his rights under R.C. 3319.16, Elsass filed a complaint in the trial court challenging his termination, asserting that there was insufficient evidence to support the charges against him, and alleging numerous other procedural and substantive errors which allegedly denied Elsass his due process rights. The trial court held a hearing on the matter on August 5, 2010. Neither party requested to submit additional testimony or evidence. The parties each filed a pre-hearing brief and gave a thirty-minute "oral argument," during which time the trial court asked each attorney numerous questions.

{¶20} On August 23, 2010, the trial court filed its judgment entry affirming the Board's termination of Elsass. The trial court found that the Board had followed the appropriate procedures and that Elsass' claims that he was denied due process were overruled.

{¶21} As to Elsass' claims that the decision to terminate him was against the weight of the evidence, the trial court stated:

> **This court cannot replace its judgment for that of the finder of fact who saw and listened to the witnesses and had the advantage of being able to weigh the evidence in light of the**

> **manner of testifying and all of those factors that triers of fact use to determine credibility of the witnesses and what weight to give to the testimony. [Elsass'] argument concerning the evidence not supporting that finding is not in accordance with established law and is rejected. \*\*\***
>
> **Masturbating in public, as found by the hearing officer, warrants termination.**

(Aug. 23, 2010 J.E. Decision on Merits and Judgment, Vol. 182, p. 644.) However, the trial court also noted that the referee's decision was based upon a "marginally thin" determination of the factual issues. Id.

{¶22} The trial court also reviewed Elsass' complaints that the referee should have considered Elsass' past record as a teacher and the materials that were proffered but not admitted. The trial court determined that this was an error, but it was a "harmless error" (pursuant to R.C. 2309.59); that "substantial justice" had been done; and, that the alleged errors were not prejudicial to Elsass. (Id. at Vol. 182, p. 643.)

{¶23} However, due to the close determination of the evidence and upon consideration of Elsass' thirty-four year teaching record, the trial court held that a "modification of the Order of the Board will do more complete justice." (Id. at p. 644.) Therefore, the trial court modified the Board's order and allowed for Elsass' to receive back pay and benefits from the time of his suspension through the May 12th date of termination. (Id.)

{¶24} St. Marys appealed the trial court's decision to award back pay, arguing that the statutes do not provide for payment to a teacher who has been rightfully terminated and that this was not a matter before the trial court for review. Elsass filed a cross appeal challenging the trial court's affirmance of his termination.

{¶25} St. Marys sets forth the following two assignments of error in its appeal.

**St. Marys' First Assignment of Error**

**The trial court erred in awarding back pay while, at the same time, affirming the Order terminating the teacher's contract for good and just cause.**

**St. Marys' Second Assignment of Error**

**The trial court erred in modifying the Board's Order suspending the teacher without pay where the statute does not permit review of that Order.**

{¶26} In his cross-appeal, Elsass raises the following assignment of error for our review.

**Elsass' Cross-Assignment of Error**

**The trial court committed reversible error when it failed to reinstate Tom Elsass to his teaching position with full back pay and benefits.**

*Elsass' Cross-Appeal*

{¶27} We will first address Elsass' cross-appeal, in which he claims that the trial court committed reversible error when it affirmed the Board's decision to terminate his contract. Within his assignment of error, Elsass raises multiple issues that he claims require the reversal of the trial court's decision, including: (1) whether the law requires a consideration of a teacher's past employment history, even if the alleged misconduct was not related to performance; (2) whether the trial court utilized the correct standard of review; (3) whether the trial court abused its discretion in concluding that the weight of the evidence supported termination; and, (4) whether the trial court erred in finding that the Board did not violate Elsass' due process rights.

{¶28} The Ohio Teacher Tenure Act, contained in R.C. Chapter 3319, governs the employment of public school teachers in Ohio. R.C. 3319.16 delineates the procedural requirements that must be followed before a teacher's contract may be terminated for disciplinary reasons. The statute specifies that "[t]he contract of any teacher employed by the board of education of any ***

school district may not be terminated except for good and just cause."[2]  R.C. 3319.16.

{¶29} Before terminating a contract, the employing board must furnish the teacher with a written notice of its intention to terminate the contract containing the grounds for action.  Id.  The teacher may then file a written demand for a hearing "before the board or before a referee."[3]  Id.  A board may suspend a teacher pending final action to terminate the teacher's contract if the board believes that the character of the charges warrants such an action.  Id.

{¶30} If a hearing is conducted by a referee, the referee must file a report. After considering the referee's report, "the board, by a majority vote, may accept or reject the referee's recommendation on the termination of the teacher's contract."  Id.  When the hearing has been conducted by a referee, a board must accept the referee's findings of fact, unless they are against the greater weight or preponderance of the evidence.  *Aldridge v. Huntington Local School Dist. Bd. of Edn.* (1988), 38 Ohio St.3d 154, 527 N.E.2d 291, at paragraph one of the syllabus. However, the school board has the discretion to accept or reject the referee's

---

[2] Prior to an amendment, effective October 16, 2009, the statute stated that "the contract of any teacher may be terminated only for gross inefficiency or immorality; for willful and persistent violations of reasonable regulations of the board of education; or for other good and just cause."  The Ohio Supreme Court has stated that "other good and just cause" must involve a "fairly serious matter." *Hale v. Bd. of Edn., City of Lancaster* (1968), 13 Ohio St.2d 92, 98-99, 234 N.E.2d 583.  The change does not affect Elsass' case.

[3] The statute further provides the time frame for carrying out the process and provides that both parties may be present at the hearing and be represented by counsel; they may subpoena witnesses and question them under oath; and a record of the proceedings shall be taken and provided to the teacher.  Id.

recommendation, unless the school board's decision is contrary to law. Id. at paragraph two of the syllabus.

{¶31} A teacher whose contract has been terminated may appeal the board's decision to the local court of common pleas by filing a complaint against the board, alleging the facts "upon which the teacher relies for a reversal or modification of the order of termination of contract." R.C. 3319.16. After the common pleas court examines the transcript and record of the hearings, it "shall hold such additional hearings as it considers advisable, at which it may consider other evidence in addition to the transcript and record." Id.

{¶32} After the hearing, the trial court shall "grant or deny the relief prayed for in the complaint as may be proper in accordance with the evidence adduced in the hearing." Id. Either the teacher or the board may appeal from the court of common pleas' decision. Id.

{¶33} Our appellate review of the trial court's decision in this special proceeding is "extremely narrow" and "strictly limited to a determination of whether the common pleas court abused its discretion." See *James v. Trumbull Cty. Bd. of Edn.* (1995), 105 Ohio App.3d 392, 396, 663 N.E.2d 1361. "Absent an abuse of discretion, an appellate court may not engage in what amounts to a substitution of the judgment of the common pleas court." Id. "Therefore, appellate courts must take great care in applying the abuse of discretion standard,

making sure that a reversal occurs only where the trial court truly acted unreasonably or unconscionably." *Johnson v. Edgewood City School Dist. Bd. of Edn.*, 12[th] Dist. No. CA2008-09-215, 2009-Ohio-3827, ¶9. Most instances of abuse of discretion result from decisions which are "simply unreasonable," having "no sound reasoning process that would support [the] decision." Id. at ¶11, quoting *James* at 396, 663 N.E.2d 1361.

> *Elsass' First Issue: The trial court abused its discretion when it held that the referee's error of excluding evidence regarding Mr. Elsass' teaching career was harmless.*

{¶34} In Elsass' first issue, he claims that "Ohio law mandates that a board of education must first consider the teacher's employment record before imposing the sanction of termination." (Cross-Appellant's Brief, p. 10.) Elsass complains that the failure to consider his teaching record impacted the issue of mitigation; affected the referee's credibility determination; and was central to the question of whether he committed the act with which he was charged. Therefore, he maintains that the trial court erred when it determined that the omission of Elsass' proffered documents concerning his teaching career was only a "harmless error." We find that Elsass' arguments concerning this issue fail for several reasons.

{¶35} First, in this case, Elsass' teaching record did not have anything to do with the ultimate issue in this case, i.e., did he masturbate in public at a school event. The cases that Elsass cites wherein courts held that it was an error to

exclude evidence of the teacher's entire record are all completely distinguishable because the teacher's classroom abilities and record of dealing with students was the central issue that was being evaluated in order to determine whether the teacher should be terminated. See, e.g., *Stalder v. St. Bernard-Elmwood Place City School Dist.,* 1st Dist. No. C-090632, 2010-Ohio-2363 (finding that there was no good and just cause to terminate a teacher because of one relatively minor incident, where the Board failed to consider the teacher's 20-year exemplary teaching record or his evaluations which complimented him on his ability to maintain "control of his classroom" and described him as a "good role model.")

**{¶36}** In another case, where the teacher was being disciplined for falsifying a sick leave statement, the board had a choice of either suspending or terminating the teacher. *Katz v. Maple Hts. City School Dist. Bd. of Edn*. (1993), 87 Ohio App.3d 256, 264, 622 N.E.2d 1. The school board ignored the referee's recommendation to only suspend the teacher and further ignored the teacher's record demonstrating that she was an effective teacher, was well-respected, had no prior disciplinary infractions, and was under severe emotional pressure at the time of the offense. Id. The Eighth District Court of Appeals held that "*where \*\*\* the relevant statutory provisions and the teaching contract itself provides for a range of possible sanctions for a particular offense*, it is necessary that a superintendent take into account a teacher's employment record prior to recommending a

particular sanction." (Emphasis added.) Id. at 263. In contrast, the applicable statute in this case does not provide for a range of possible sanctions for public masturbation. There is no mandate, either in statute or case law, to consider every aspect of Elsass' entire teaching career under the facts and circumstances of this type of case.

**{¶37}** Furthermore, we find that there *was* extensive evidence before the referee concerning Elsass' competence as a mathematics teacher, his record in the school system, and his teaching abilities in mathematics. Elsass himself testified at length about his educational experience and accomplishments. There was also testimony concerning his teaching skills from numerous character witnesses. The additional materials that Elsass wanted to admit were generally dated, irrelevant, and cumulative.[4] The documents would not have provided any new information concerning Elsass' credibility, his competence as a teacher, or whether or not he masturbated in the parking lot. Furthermore, the trial court, which was entitled to view additional evidence, did look at the proffered documents and determined that their exclusion had not caused any prejudice to Elsass.

---

[4] More than 80% of the proffered documents were from the year 2000 or before (even into the 1980's), and many were redundant and referenced the same matter. Some of the evidence was indicative of his proficiency as a mathematics teacher, such as certificates for outstanding math teacher; faculty leadership, and his qualification as a National Board Certified Teacher. However, the only performance reviews were from 1989, and the most recent document was from 2006. Some of the documents were merely letters indicating that he had participated in a professional seminar, or were newspaper articles concerning programs and activities that he conducted with his classes. While these documents demonstrated professional accomplishments, that was not the issue being decided.

**{¶38}** And finally, because the decision to terminate Elsass was decided by merely a preponderance of the evidence, Elsass argues that the positive materials in his personnel file would have bolstered his credibility determination and tipped the decision in his favor. However, as noted above, the materials were not really relevant to the matter at hand and even Elsass' attorney, when questioned by the trial court, admitted that she could not think of a single accolade or document in Elsass' personnel file that would have gone directly to his character for truthfulness. (Aug. 5, 2010 Hearing Tr., p. 59.) Furthermore, in addition to the materials favorable to Elsass, the Board also proffered several documents that called into question Elsass' professional judgment and his ability to adhere to school policies and procedures.[5] Any benefit that Elsass *might* have gained from the referee's consideration of his proffered documents likely would have been countered by the Board's negative records from Elsass' personnel file.

**{¶39}** Elsass' claim that it was a reversible error for the referee to exclude the proffered records of his teaching career fails for several reasons. Although the trial court found that the exclusion was a "harmless error," we find that the referee and the trial court had already reviewed considerable evidence pertaining to

---

[5] The Board's proffered documents were incident issues and letters of reprimand from 2009, 2008, 2006, two from 2000, and one from 1990. They included several instances where he had repeatedly left his class unattended while he would go to smoke, even after being repeatedly warned not to do so; incidents of inappropriate conduct where he had made comments that were found to be "close to harassment"; the making of racially insensitive comments; and poor judgment in smoking and the consumption of alcohol while he was coaching a school sporting event.

Elsass' teaching record and there was no error at all in the exclusion of the irrelevant and superfluous exhibits.

> *Elsass' Second Issue: The trial court committed reversible error when it applied an improper standard of review.*

{¶40} In his second issue, Elsass claims that the trial court erred when it gave deference to the referee's report and findings of fact. Elsass argues that, because the trial court allegedly found that "the facts in the record could have just as easily led to a finding that Mr. Elsass did nothing wrong," the court should have held additional hearings to weigh the evidence, determine the credibility of witnesses, and render its own factual determinations. (Cross-Appellant's brief, p. 13.) Elsass claims that the trial court abused its discretion when it found that the weight of the evidence did not support the referee's findings, "yet deferred to those findings despite their clear error." (Id. at p. 21)

{¶41} We find that Elsass' arguments concerning this issue are without merit for two reasons. First, we find that the trial court correctly followed the statutes and applicable case law, and that it applied the correct standard of review. And secondly, Elsass has mischaracterized the trial court's determination concerning the referee's findings of facts.

{¶42} When a teacher's contract termination proceeding is conducted by a referee pursuant to R.C. 3319.16, a board of education must accept the referee's

findings of fact unless they are against the greater weight or preponderance of the evidence. *Aldridge*, 38 Ohio St.3d 154, at paragraph one of the syllabus. Additionally, the Ohio Supreme Court has repeatedly held that due deference must be accorded to the findings and recommendations of the referee because it is the referee who is in the best position to observe the demeanor of the witnesses and weigh their credibility. *Jones v. Franklin Cty. Sheriff* (1990), 52 Ohio St.3d 40, 43, 555 N.E.2d 940, 944, citing *Aldridge*, 38 Ohio St.3d at 157, 527 N.E.2d at 293; *Graziano v. Amherst Exempted Village Bd. of Edn.* (1987), 32 Ohio St.3d 289, 293, 513 N.E.2d 282, 285.

{¶43} Although the common pleas court's review of a board's decision is not de novo, R.C. 3319.16 does empower the court to weigh the evidence, hold additional hearings if necessary, and render factual determinations. *Graziano*, 32 Ohio St.3d at 293, 513 N.E.2d at 285; *Katz*, 87 Ohio App.3d at 260. However, nothing in the statute absolutely requires the reviewing court to do so. See R.C. 3319.16 (stating that the court "shall hold such additional hearings *as it considers advisable,* at which it *may* consider other evidence in addition to the transcript and record.") (Emphasis added.) A common pleas court may reverse a board's order of termination of a teacher's contract only where it finds that the order is not supported by or is against the weight of the evidence. *Hale v. Lancaster Bd. of Edn.* (1968), 13 Ohio St.2d 92, 42 O.O.2d 286, 234 N.E.2d 583, paragraph one of

the syllabus; *Oleske v. Hilliard City Sch. Dist. Bd. of Edn.* (2001), 146 Ohio App.3d 57, 62, 764 N.E.2d 1110. If there exists "substantial and credible evidence" in support of the charges of the Board, and "a fair administrative hearing is had, the [common pleas court] cannot substitute its judgment for the judgment of the administrative authorities." *Bertolini v. Whitehall City Sch. Dist. Bd. of Edn.* (2000), 139 Ohio App.3d 595, 604, 744 N.E.2d 1245, quoting *Strohm v. Reynoldsburg City School Dist. Bd. of Edn.* (Mar. 31, 1998), Franklin App. No. 97APE07-972. Moreover, courts generally hold that, absent a claim that the school board violated a statutory right or constitutional obligation, a trial court may not substitute its judgment for that of the board. See Id.; *Kitchen v. Bd. of Edn. of Fairfield city School Dist.*, 12th App. No. CA2006-09-234, 2007-Ohio-2846.

{¶44} We find that the trial court properly applied this standard of review. Although the trial court acknowledged that the decision basically came down to a credibility determination between Koontz' version of events as compared to Elsass' story, contrary to Elsass' assertions, the trial court did not conclude that the referee's recommendation failed to meet its burden of proof. The trial court expressly considered Elsass' argument that the decision was not supported by the weight of the evidence and concluded that:

**The unsubstantiated testimony of one witness if believed by the finder of fact is sufficient to warrant the finder of fact to conclude the issue of whether the teacher was masturbating in the parking lot by a preponderance of the evidence. This court cannot replace its judgment for that of the finder of fact who saw and listened to the witnesses and had the advantage of being able to weigh the evidence in light of the manner of testifying and all of those factors that triers of fact use to determine credibility of the witnesses and what weight to give to the testimony. [Elsass'] argument concerning the evidence not supporting that finding is not in accordance with established law and is rejected.**

(Id. at p. 644.)

{¶45} Elsass then points to the next sentence in the decision, in which the judge states, "[w]hile a review of the transcript would have equally supported a finding by the hearing officer that the witness was mistaken ***" as support for his assertion that the trial court did not find that the Board's decision was supported by a preponderance of the evidence. Taken out of context, this statement could potentially stand for that position. However, the trial court expressly decided that because he did not have the advantage of observing the witnesses to determine who was telling the truth, he could not second-guess the decision of the fact-finder who did have that opportunity and vantage point. It is often stated that "determining credibility from a sterile transcript is a Herculean endeavor." See, e.g., *State v. Thompson* (1998), 127 Ohio App.3d 511, 529, 713 N.E.2d 456. While the trial court did state that it "*may* have ruled differently *if* it

-23-

had heard the live testimony," it clearly acknowledged that it had *not* heard the live testimony and, therefore, "this court cannot second-guess that decision." (Emphasis added.) (J.E. at p. 644.) "[T]he hearing officer as finder of fact with the advantage of seeing and hearing the live testimony is charged with the factual determinations." (Id.)

{¶46} Elsass is correct in his assertion that R.C. 3319.16 allows a trial court to reopen the hearing and listen to new testimony and evidence, even as to credibility issues. *Graziano*, supra, 32 Ohio St.3d at 293. However, nothing in R.C. 3319.16 requires the reviewing court to re-decide credibility determinations. Neither party asked the trial court to do so in this case. The trial court explained that, "this Court gave [Elsass] an opportunity to present additional evidence before it, and he had no additional evidence to offer, so his claims concerning being denied an opportunity to present additional evidence when he has no additional evidence to present are spurious." (J.E. at p. 640.)

{¶47} The decision in this case turned upon who the referee believed after hearing all of the witnesses testify. Given that no party asked to re-open the testimony in the court of common pleas, the trial court gave due deference to the referee's findings of fact and determination of credibility. The trial court's deference to the fact finder, who was able to assess the witness' credibility in person, was in no way unreasonable, arbitrary, or unconscionable.

*Elsass' Third Issue: The trial court abused its discretion in concluding that the weight of the evidence supported termination.*

**{¶48}** Elsass contends that the Board failed to prove its case by a preponderance of the evidence. He alleges that Koontz was not a credible witness and his testimony "did not make sense." Elsass continues to argue that the evidence supported his version of events. He also asserts that the referee incorrectly created the presumption that Elsass' testimony was false because of the fact that Elsass had an interest in preserving his reputation and career.

**{¶49}** Our review of the trial court's decision in this appeal is limited to whether the trial court abused its discretion when affirming the Board's order. Thus, upon review, we must find more than error of judgment. The trial court's attitude must be unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 218-219, 450 N.E.2d 1140. Judgments supported by "some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Construction Co.* (1978), 54 Ohio St.2d 279, 280, 376 N.E.2d 578; see, also, *Oleske*, 146 Ohio App.3d at 62.

**{¶50}** As discussed above, the trial court showed deference to the referee's determinations of credibility because he was able to see and hear the witnesses

testify in person, observe their demeanor, and utilize all of the other tools that a finder of fact uses in assessing credibility. The referee did a thorough analysis of the credibility of each of the witnesses, explaining in detail the reasons for his decisions and the facts supporting those decisions.

{¶51} The referee examined each of the claims Elsass raised concerning Koontz' credibility, and found that four of the five alleged incidents had no adverse impact on Koontz' credibility. In fact, for one of the allegations, the referee noted that Koontz was "no billed" on two separate occasions and that "Koontz [was] more the victim in connection with these matters as opposed to a criminal." (Ref. rpt. p. 13.) The only incident potentially affecting Koontz' credibility was a July 2009 charge for obstructing official business (Koontz was found guilty in January 2010.) The referee found that this conviction did have a negative impact on Koontz' credibility. However, because no additional information specifying the exact nature of the improper conduct was provided, the referee found it difficult, if not impossible, to quantify the extent of negative impact. In fact, with those charges pending at the time of the parking lot incident, the referee believed that it was highly unlikely that Koontz would knowingly call the police to falsely accuse Elsass, thereby risking the filing of additional criminal charges against him for falsification. The referee found that Koontz' version of the events had remained consistent throughout.

{¶52} The referee also thoroughly examined all aspects of Elsass' credibility and the believability of Elsass' version of events. The referee questioned why Elsass remembered so many minute details of the happenings from that day six months earlier (such as everything that he ate for dinner that evening, the exact scores of each of the volleyball games, precise details as to everything he did after school that day, etc.), and yet his memory was "far less accurate" when he was asked about certain events which had a direct bearing on the outcome of the proceedings. The referee also noted some inconsistencies between Elsass' written statement and his testimony.

{¶53} The referee was also concerned about several credibility issues concerning Elsass' claimed "wet spot." Elsass testified that his urinary problems that had existed "for years." However, the referee questioned why Elsass never consulted a doctor about this problem until a few days *after* the incident. And, if he knew that he spotted his clothing "every time" he urinated, why didn't he utilize some type of protection, or at least check himself before he left the restroom? Furthermore, if the spot was so large and noticeable, why hadn't his wife mentioned it when she was with him just moments before? Finally, the referee wondered why Elsass would "vigorously rub" his shorts in open view of the public when he was standing beside his own car. He could have simply

entered the car and discreetly dried his shorts. Elsass had mentioned that there was a blanket in the van.

{¶54} In trying to determine which individual was "lying" and which one was "telling the truth," the referee weighed numerous factors. One of those factors was that Koontz did not appear to have any motivation to lie, whereas Elsass had a strong interest in protecting his career and reputation. Contrary to Elsass' assertions, the referee and trial court did not improperly shift the burden and create a "presumption" against Elsass because of that. This matter was raised before the trial court, and Elsass' attorney acknowledged that a party's "interest and bias" could be a factor used in judging the credibility of a witness. At the hearing, the trial court read the following (from the court's standard instructions to juries):

> **To weigh the evidence you must consider the credibility of the witness. You will use the test of truthfulness which you use in your daily lives. These tests include the appearance of each witness on the stand, their manner of testifying, the reasonableness of the testimony, the opportunity they had to see, hear, and know the things concerning that which they testified, their accuracy of memory, their frankness or lack of it, their intelligence, *their interest and bias*, if any, together with all of the facts and circumstances surrounding the testimony.**

(Emphasis added.) (Hearing Tr., p. 19.) The trial court then asked:

> **THE COURT: So the evaluation of, for example, the interest and bias that may be present in any particular witness is to be one of the things considered?**

**[ELSASS' ATTORNEY:]** Correct.

(Id.)

**{¶55}** Elsass' argues that "the only credible testimony presented at the hearing was that of Mr. Elsass and his friends and family." That was not what the referee determined. The trial court, in its review of the record, found that there was sufficient competent and credible evidence in the record to sustain the referee's findings and the Board's decision. We find that the trial court's decision in this regard was reasonable and supported by the evidence in the record. Therefore, the trial court did not abuse its discretion.

> *Elsass' Fourth Issue: The trial court abused its discretion and committed reversible error when it held that substantial justice had been done in this matter.*

**{¶56}** In the final issue raised by Elsass, he claims that he was denied due process and substantial justice was not done because he wasn't given the opportunity to be heard and to respond to the charges against him "at a meaningful time and in a meaningful manner." Specifically, Elsass complains that his due process rights were violated when: (1) he was "blindsided" in the initial meeting with the superintendent and given the choice of resigning or being fired; (2) the initial meetings with the board to respond to the charges weren't rescheduled until after his criminal charges were resolved; (3) the Board did not provide him the

opportunity to have a hearing with the board after the referee's recommendations; and (4) the Board failed to hold a hearing upon the referee's recommendation or allow Elsass the opportunity to present additional evidence in support of his position.

{¶57} We have already outlined the requirements that have been mandated by statute to protect a teacher's due process rights during a termination proceeding. The trial court reviewed all of Elsass complaints about alleged due process violations and found that they were baseless.

{¶58} Due process rights guaranteed by the United States and Ohio Constitutions apply in administrative proceedings, such as a teacher termination. See, e.g., *Cleveland Bd. of Educ. v. Loudermill* (1985), 470 U.S. 532, 545, 105 S.Ct. 1487, 84 L.Ed.2d 494. R.C. 3319.16 provides for the normal due process safeguards, giving the teacher notice and an opportunity for a hearing, and including a right to appeal the board's decision to the court of common pleas.

{¶59} We do agree with Elsass' first claim, that St. Marys did not follow proper procedures when he was *initially* confronted without any warning and given the choice of immediately resigning or being fired. However, St. Marys remedied that error and followed proper procedures thereafter to safeguard Elsass' rights throughout the proceedings. The Board immediately set up two dates to give Elsass an opportunity to respond to the allegations. The Board was under no

obligation to indefinitely postpone those initial meetings and stay the administrative proceedings until after Elsass' criminal proceedings were resolved.

{¶60} Elsass also complains that he should have been given another hearing before the Board *after* the referee held a hearing and issued his recommendations. However, R.C. 3319.16 specifically states that a teacher may demand a hearing "before the board *or* before a referee," not both.[6] (Emphasis added.) Elsass chose a hearing in front of a referee. During those proceedings he was represented by a competent attorney, he was permitted to fully explain his actions, he presented numerous witnesses on his behalf, and he had a full opportunity to challenge the Board's key witnesses. R.C. 3319.16 does not contain any requirement that a teacher be afforded an opportunity to refute the contents of a referee's report in the period between the filing of the report and its acceptance or rejection by the board

---

[6] Elsass cites to a 1983 First District Court of Appeals decision for the proposition that the statute provides a three-tiered review, with a hearing first before a referee, then another hearing before the board, and finally, an appeal to the court of common pleas. *Wheeler v. Mariemont Dist. Bd. of Educ.* (1983), 12 Ohio App.3d 102, 108, 467 N.E.2d 552. Elsass claims that this decision overruled sub silentio a prior decision by the same district. See *Jones v. Bd. of Educ., Mt. Healthy City School Dist.* (1978), 60 Ohio App.2d 138, 395 N.E.2d 1337 (discussing in detail that, a terminated teacher has a right to either a hearing before an impartial referee or the board, but not both.) The *Wheeler* decisions appears to be an anomaly and in error, as the plain language of the statute does not support that interpretation and the decision did not provide any citations, support, or reasoning for its statement. It has never been cited for this proposition. Subsequently, in *Aldridge*, the Ohio Supreme Court delineated the respective responsibilities of the referee and the board in the statutory termination process, and clearly stated that the referee had primary responsibility for findings of fact, and the school board had the right to review them. Id. at 159. It did not state that there was any provision for the board to hold hearings or do fact-finding of its own, after a referee had conducted a fact-finding hearing. It clearly stated that when a teacher requested a hearing before a referee, the board's only options were to either accept or reject the recommendation of the referee, unless contrary to law. Id. at paragraph two of the syllabus. See, also, paragraph 30 above in this opinion.
.

of education, nor does it provide for an additional hearing before the board if the teacher does not like the results of the hearing before the referee.

**{¶61}** Elsass has failed to demonstrate any due process violation. The trial court correctly overruled Elsass' claims, finding that the Board followed all appropriate procedures. Based upon our discussion of all of the issues raised by Elsass in his cross appeal, we do not find that the trial court abused its discretion when it affirmed the Board's decision to terminate Elsass. Elsass' assignment of error is overruled.

### *St. Marys' Appeal*

**{¶62}** In its appeal, St. Marys contends that the trial court erred in awarding back pay while, at the same time, affirming the Board's order terminating Elsass' contract for good and just cause. St. Marys asserts that: (1) the trial court did not have the authority to modify the Board's decision and create a remedy that was not provided for in the statute; and (2) the trial court's review was limited to the Board's termination decision and it was not permitted to modify the Board's previous resolution to suspend Elsass without pay. Because both of the Board's assignments of error are closely related, we will review them together.

**{¶63}** These issues involve whether or not the trial court had the legal authority under R.C. 3319.16 to award back pay to a non-prevailing teacher and to modify a board of education's prior order (Elsass' suspension without pay) that

was not specifically before the court. As such, they are clear questions of law, calling for a de novo review.

**{¶64}** The trial court's decision found that substantial justice had been done; that any alleged errors or defects occurring at the hearing were not prejudicial and were to be disregarded; that Elsass' actions warranted termination; and that the order terminating his teaching contract should be affirmed. However, the trial court then decided to award Elsass a type of equitable "consolation prize" and modified the Board's termination order to award Elsass eight months of back pay for the time the Board had suspended him without pay. The trial court stated that this modification would do more "complete justice."

**{¶65}** The trial court claimed that it had the authority to modify the Board's orders pursuant to R.C. 2309.59. That statute provides that a court shall disregard any error or defect in the pleadings or proceedings which does not affect the substantial rights of the adverse party. However,

> **[i]f the reviewing court determines and certifies that, in its opinion, substantial justice has been done to the party complaining as shown by the record, all alleged errors or defects occurring at the trial shall be deemed not prejudicial to the party complaining and shall be disregarded, and the final judgment or decree under review shall be affirmed***, or it shall be modified if, in the opinion of such reviewing court, a modification of it will do more complete justice to the party complaining.***

(Emphasis added.) R.C. 2309.59.

-33-

**{¶66}** While it is true that a reviewing court has the right to modify orders under certain specified circumstances, any such modification must be within the reviewing court's authority and jurisdiction, and must be within the appropriate limits as provided for by law. Here, the General Assembly has created a series of rights to be afforded a tenured teacher in Ohio and established specific remedies and procedures to be applied regarding those rights. Accordingly, the termination of a teaching contract is governed by R.C. 3319.16, which provides the exclusive rights and remedies for a teacher facing termination of his employment contract. The Ohio Supreme Court has stated that "[w]here the General Assembly by statute creates a new right and at the same time prescribes remedies or penalties for its violation, the courts may not intervene and create an additional remedy." *State ex rel. Ohio Democratic Party v. Blackwell*, 111 Ohio St.3d 246, 2006-Ohio-5202, 855 N.E.2d 1188, ¶34, quoting *Fletcher v. Coney Island Inc.* (1956), 165 Ohio St. 150, 154, 134 N.E.2d 371.

**{¶67}** R.C. 3319.16 provides that a teacher can either be terminated or be reinstated with back pay. *Vogelsang v. Toledo Bd. of Educ.* (Jan. 31, 1986), 6th App. No. L-85-243, 1986 WL 1288. The statute specifically states:

> **Any order of termination of a contract shall state the grounds for termination. If the decision, after hearing, is against termination of the contract, the charges and the record of the hearing shall be physically expunged from the minutes, and, if the teacher has suffered any loss of salary by reason of being**

> **suspended, the teacher shall be paid the teacher's full salary for the period of such suspension.**

R.C. 3319.16. The statute *only* provides for lost salary reimbursement when the termination was found to be wrong and the teacher is reinstated. Id. There is no provision anywhere within the statute for finding that the termination of a teacher was proper, yet still finding that the teacher was entitled to be awarded back pay. "The option of awarding back-pay is included within the statute where there is a determination that termination was not the proper remedy. If a decision is upheld to terminate a teacher's contract, then the award of back-pay would not be logical." *Vogelsang*, supra. The trial court's actions in awarding Elsass back pay amounted to unauthorized intervention that created an additional remedy not provided for by law.

{¶68} The trial court's decision also focused on language in R.C. 3319.16 stating that when a teacher appeals to the court of common pleas, the teacher shall file a complaint "in which complaint the facts shall be alleged upon which the teacher relies for a reversal *or modification* of such order of termination of contract." (Emphasis added.) R.C. 3319.16. However, as discussed above, the only permissible options for the final order are termination or reinstatement (with back pay, if appropriate.) *If* there was some error, defect, or omission in the reports and orders below that needed to be corrected or adjusted, then the statute

-35-

provides that the teacher may include a request for such a *modification* in its complaint.[7] However, there is no provision for the trial court to substitute its judgment for that of the referee and board below and craft an entirely new remedy.

{¶69} The trial court further offered an example wherein the Ohio Supreme Court modified a judgment in a "creative way" in order to "accomplish justice," citing to *Dardinger v. Anthem Blue Cross & Blue Shield*, 98 Ohio St.3d 77, 2002-Ohio-7113, 781 N.E. 2d 121. In *Dardinger*, the Supreme Court used the power to order a remittitur to reduce what it determined to be an excessive punitive damages award from $49 million to $30 million, and to distribute $20 million of that to cancer research, with the remaining $10 million going to the deceased's estate. Id. at ¶¶181-190. However, the *Dardinger* case has nothing to do with the facts and law applicable in the case before us.[8] Furthermore, the Ohio Supreme Court carefully cited to the applicable law upon which it relied for its authority to order such a remitter. As discussed above, R.C. 3319.16 does not allow for the trial court's creative decision in this case.

{¶70} Finally, the Board argues that its decision to suspend Elsass without pay was never challenged by Elsass; it was never appealed by Elsass; no evidence

---

[7] For example, as noted above, the Board originally found three grounds for termination. Upon review, the referee found that the criminal charges in the third grounds for termination had been dismissed. *If* the referee had failed to do so, Elsass would certainly have been justified in seeking a *modification* of the recommendation and order to correct this.

[8] Although we can understand how easily one might construe it as allowing a court to do whatever it wishes.

-36-

was ever presented concerning the suspension-without-pay; and it is not a decision that is reviewable under the statute (*unless* the termination is found to be improper.)  Elsass counters that it was before the trial court by virtue of the final prayer in Elsass complaint that the court "award the Plaintiff any and all other relief which this court deems just and proper."

{¶71} The Board's assertions above are correct.  Elsass' vague and general prayer does not allow a trial court to award relief that is not provided for within the law.  Therefore, the Board's assignments of error are sustained.

{¶72} Having found no error prejudicial to the Cross-Appellant, Tom Elsass, herein in the particulars assigned and argued in his cross-appeal, we affirm the judgment of the trial court as it pertains to the termination of his teaching contract.

{¶73} However, having found error prejudicial to the Appellant, St. Marys City School District Board of Education, we reverse the judgment of the trial court as it pertains to the "modification" of the Board's order by awarding back pay to Elsass, and remand this matter to the trial court for further proceedings consistent with this opinion.

*Judgment Affirmed in Part,*
*Reversed in Part and*
*Cause Remanded*

**ROGERS, P.J. and PRESTON, J., concur.**
/jlr